Sabina U. WEISBROT, Plaintiff–
Appellant,

v.

MEDICAL COLLEGE OF WISCONSIN,
Defendant–Appellee.

No. 95–2264.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1996.

Decided March 28, 1996.

Christopher Lowe (argued), Milwaukee, WI, for Plaintiff–Appellant.

Carolyn Gnaedinger (argued) and Pamela Ploor, Quarles & Brady, Milwaukee, WI, for Defendant–Appellee.

Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Sabina Weisbrot filed this suit under Title VII and the Age Discrimination in Employment Act ("ADEA") after her employer, the Medical College of Wisconsin ("MCW"), terminated her employment as a Research Technician. The district court granted MCW's motion for summary judgment on both claims. Ms. Weisbrot now appeals the entry of summary judgment on her ADEA claim. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

Sabina Weisbrot, a sixty-five year-old Polish immigrant, worked at MCW from June 1972 until her discharge in February 1992. Ms. Weisbrot was hired as a Laboratory Technician by Dr. Ronald Kalkhoff, then Chief of the Endocrine/Metabolic Division of the MCW Department of Medicine. She was reclassified as a Research Technician in 1983 and continued to work for Dr. Kalkhoff until his death in December 1990. Dr. Kalkhoff directed the TOPS Obesity and Metabolic Research Program at MCW, which was funded entirely by a grant from the TOPS Club,

Inc., an outside funding agency.[1] His research was conducted separately from the remainder of the Endocrine/Metabolic Division in an entity informally denominated the "Kalkhoff Division."

Upon Dr. Kalkhoff's death in December 1990, Dr. Ahmed Kissebah was appointed Interim Director of the TOPS program at MCW. At that time, there were three employees in the "Kalkhoff Division": Jacqueline Marks (Laboratory Supervisor—age 53); Ann Schwoerer (Administrative Secretary—age 35); and Sabina Weisbrot (Research Technician—age 64). The TOPS grant funded the salaries and fringe benefits for these three employees.[2]

Soon after Dr. Kalkhoff's death in 1990, Dr. Kissebah learned that funding for the TOPS program at MCW would be discontinued. Although Dr. Kissebah was unsuccessful in his attempt to secure additional funding, TOPS did agree to make one final payment to the program that would fund it through June 30, 1992—the end of MCW's fiscal year. The TOPS Club, Inc. requested that Dr. Kissebah use his discretion in determining the best use of the final payment in light of the fact that the program was to be phased out. Dr. Kissebah determined that there was some research value in completing certain laboratory work begun by Dr. Kalkhoff. Accordingly, on October 24, 1991, Dr. Kissebah submitted a budget for the final TOPS payment that funded Ms. Weisbrot's salary through February 1992 and the salaries of Ms. Marks and Ms. Schwoerer through November 1991. The budget called for any remaining TOPS funds to be preserved and awarded to other faculty investigators interested in pursuing obesity research.

When the TOPS program was eliminated, Dr. Kissebah arranged for Ms. Marks to occupy an equivalent Laboratory Supervisor position at MCW. She did not file a formal application to transfer to this new position. Ms. Schwoerer, the administrative secretary, declined a similar offer from Dr. Kissebah because she preferred to collect unemployment compensation. Ms. Weisbrot was not offered an equivalent position and, on January 24, 1992, MCW notified Ms. Weisbrot that her position would be terminated at the end of February.

From September 5, 1991, to February 27, 1992, the MCW "Job Opportunities Bulletin" listed four Research Technician positions and seven Senior Research Technician positions as vacant. Each of these positions would have been considered either an inter-section transfer or a promotion for Ms. Weisbrot. Accordingly, MCW policy would have required her to apply formally for these positions. With no reason to suspect that her position was being eliminated, however, Ms. Weisbrot did not apply for continued employment at MCW until after receiving her termination notice on January 24, 1991.

On February 19, 1992, Ms. Weisbrot submitted a written application for employment as a Senior Research Technician at MCW. MCW considers applications to be "active" for sixty days, and the personnel office for-

---

1. TOPS is an acronym for "Take Off Pounds Sensibly."

2. MCW is a typical academic medical facility; most of the research work is conducted by faculty members who receive grants from outside funding sources. At MCW, a faculty member who receives a research grant is known as a Principal Investigator. The Principal Investigator is responsible for hiring the necessary research support staff and for directing the funds from the research grant. The salaries of research personnel are paid from their Principal Investigator's research grant. If a researcher works for a Principal Investigator with multiple research grants, the researcher could be paid from more than one funding source. In such a case, the particular source of funding for the researcher's salary is determined by the Principal Investigator, the researcher's direct supervisor, the division chief, the department administrator, and the department chair.

If the source of funding for a particular project is eliminated, the research personnel working on that project are subject to losing their positions. The Principal Investigator will often seek a different source of funding for the project and, if he or she is successful, the research staff may continue to work for the Principal Investigator; their salaries simply are paid from a different source of funds. This procedure is known as a "change in funding source" and, as long as their employment is continuous and the duties and qualifications for the new position are identical, the employees are not required to submit applications for the new positions.

warded her application to the two departments (Pharmacology and Physiology) that listed openings for a Senior Research Technician during that period. Neither department offered a position to Ms. Weisbrot. MCW records indicate that neither of these positions was filled until late 1993.

On March 3, 1992, a representative of the MCW personnel office contacted Ms. Weisbrot by telephone. According to the affidavit of Dianne Golden, then Assistant Director of Employment at MCW, she contacted Ms. Weisbrot in an effort to improve her application. Ms. Weisbrot's application lacked any detailed information as to the kinds of tasks that she had performed at MCW during her employment and, again according to Ms. Golden, candidates who included detailed information on their prior experience were more likely to find employment at MCW than candidates who provided minimal information on prior work experience. Ms. Golden expressed these concerns to Ms. Weisbrot first during their telephone conversation and later in a letter dated the same day:

> As we discussed during our telephone conversation today, we have received your application for employment. We would be happy to consider you for other MCW positions for which you qualify. However, your application is not complete. That is, it does not list specific duties performed in your last position. I'm returning your application to you. On the back of the application, please list the primary duties performed during your employment in the Department of Medicine. You might also want to include the types of laboratory equipment you have used.
>
> Please return your completed application to me as soon as possible. We will then forward your application to departments with appropriate openings.

R.11, Affidavit of Dianne L. Golden, Ex.D.

Ms. Weisbrot brought this action under the ADEA, 29 U.S.C. § 621 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging that she was treated unfairly by MCW, and ultimately discharged, because of her age and national origin. Her complaint further alleges that, because of her national origin, she had been subjected to a hostile work environment while employed at MCW. The district court granted MCW's motion for summary judgment. Having abandoned her Title VII claims, Ms. Weisbrot now appeals the district court's decision to enter summary judgment against her on the ADEA wrongful termination claim.

## II

## DISCUSSION

■ Viewing the record and all inferences to be drawn therefrom in the light most favorable to the non-moving party, we review a grant of summary judgment de novo. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995); *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ The ADEA prohibits employers from discriminating against individuals forty years of age and older, 29 U.S.C. § 631(a), with respect to their compensation, terms, conditions or privileges of employment. 29 U.S.C. § 623(a). In order to maintain a claim under the ADEA, a plaintiff must establish that she would not have been treated adversely by her employer "but for" the employer's motive to discriminate against her because of her age. *Taylor*, 69 F.3d at 779; *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir.1991); *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (en banc). An ADEA plaintiff may establish age discrimination in one of two ways. She may present direct or circumstantial evidence that age was the determining factor in the adverse employment action, or she may invoke the burdenshifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to create an inference of age discrimination. *Taylor*, 69 F.3d at 779;

*Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1330–31 (7th Cir.1995).

▮ To prove discrimination under the McDonnell Douglas burden-shifting analysis, an ADEA plaintiff must establish a prima facie case by showing: (1) she was in the protected age group; (2) she was performing her job satisfactorily or was qualified for the job for which she applied; (3) she was discharged, not hired, not promoted, etc.; and (4) younger employees were treated more favorably.[3] *Taylor*, 69 F.3d at 779; *Roper v. Peabody Coal Co.*, 47 F.3d 925, 926 (7th Cir.1995). If the plaintiff establishes a prima facie case, there is a rebuttable presumption of age discrimination, see *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), and the burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for discharging the plaintiff. *Taylor*, 69 F.3d at 779. If the employer meets its burden of production, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for age discrimination. *Id.* At all times, however, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her based upon her age. *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2749; *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123–24 (7th Cir.1994).

In the instant case, the district court concluded that Ms. Weisbrot has made out a prima facie case of age discrimination under McDonnell Douglas, but that MCW has satisfied its burden of producing a legitimate, nondiscriminatory reason for Ms. Weisbrot's termination: discontinuation of funding for the TOPS program at MCW. Turning to the issue of pretext, the district court wrote:

In the face of MCW's affirmative evidence of nondiscriminatory motives, it is not enough for Ms. Weisbrot to simply cast doubt on the defendant's explanation of its employment decisions. Rather, she must introduce evidence which could persuade a reasonable jury that intentional discrimination was behind MCW's decision to terminate her.

R.20, Decision and Order of April 26, 1995, at 28 (emphasis in original) (citing *Hicks* and *Anderson*).[4] The court examined Ms. Weisbrot's evidence of pretext against MCW's explanations for its conduct and, finding that no reasonable jury could conclude that Ms. Weisbrot's discharge was motivated by intentional discrimination, entered summary judgment in favor of MCW.

Ms. Weisbrot now contends that the district court applied an incorrect legal standard in evaluating MCW's motion for summary judgment. To survive summary judgment, Ms. Weisbrot urges, she was required only to present evidence from which a rational factfinder could conclude that MCW's proffered reason was untrue; the district court erred in requiring her to introduce evidence of intentional discrimination. Applying the correct legal standard, she continues, there was sufficient evidence of pretext to preclude summary judgment.

In *Hicks*, the Supreme Court held that "[t]he factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." 509 U.S. at 511, 113 S.Ct. at 2749 (footnote omitted). Implicit in the Court's holding is the notion that, once the employee has cast doubt on the employer's proffered

---

3. We note that the Supreme Court has granted certiorari in a Fourth Circuit case, *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542 (4th Cir.), cert. granted, —— U.S. ——, 116 S.Ct. 472, 133 L.Ed.2d 401 (1995), to resolve a conflict among the circuits on the issue of whether an ADEA plaintiff can establish a prima facie case by showing that she was replaced by a younger person, or whether the employee must show instead that she was replaced by someone outside the protected class.

4. We note that, earlier in its opinion, the district court described the plaintiff's burden of demonstrating pretext in different terms. The court wrote: "At this stage of the analysis, the burden shifts back to the plaintiff to show that these nondiscriminatory reasons proffered by the defendant are merely a pretext for intentional discrimination." R.20, Decision and Order of April 26, 1995, at 24.

reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury—not the court. *Biosound,* 42 F.3d at 424 n. 4.

■ Following the Supreme Court's decision in *Hicks,* our cases have held that, in order to survive a motion for summary judgment, an employee need only "produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [her] dismissal." *Biosound,* 42 F.3d at 424 n. 4; see *Collier v. Budd Co.,* 66 F.3d 886, 893 & n. 11 (7th Cir.1995); *Dey v. Colt Constr. & Devel. Co.,* 28 F.3d 1446, 1461 (7th Cir.1994); *Anderson,* 13 F.3d at 1124; cf. *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir.1995). As the above-quoted passage from *Hicks* makes clear, this standard imposes a less onerous burden on the non-moving party than the one employed by the district court in this case.[5] Nevertheless, an ADEA case turns upon the credibility of witnesses only when the employee offers specific evidence from which the finder of fact may reasonably infer that the employer's proffered reasons for the adverse job action do not represent the truth. *Collier,* 66 F.3d at 893. Summary judgment is proper where no rational factfinder could believe that the employer lied about its proffered reasons for dismissal. E.g., *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 670 (7th Cir.1995); *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995); *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis,* 42 F.3d 403, 412 (7th Cir.1994). We turn, therefore, to evaluate Ms. Weisbrot's evidence of pretext against this standard.

■ According to MCW, Ms. Weisbrot was terminated because funding for the TOPS program was discontinued. As evidence that MCW lied about this reason for her dismissal, Ms. Weisbrot contends that: (1) Jacqueline Marks and Ann Schwoerer received more favorable treatment when funding for the TOPS program was discontinued; (2) After learning of the funding loss, MCW waited several months before notifying her that her position would be terminated; (3) MCW's handling of her application for employment—returning it to her as "not complete"—evidences MCW's desire that she not be employed; and (4) Dr. Kissebah once referred to her as an "older lady."

According to Ms. Weisbrot, MCW found an equivalent position for Jacqueline Marks and offered to find another position for Ann Schwoerer, but did not find, or offer to find, an equivalent position for her. She contends that Ms. Marks continued employment amounted to an inter-section transfer that, under MCW policy, should have required a formal application. In light of the fact that MCW had open equivalent positions for which Ms. Weisbrot was qualified, she concludes, MCW could have afforded her similar treatment and dispensed with the application requirement.

The record, however, amply supports MCW's position that Dr. Kissebah had work available for Jacqueline Marks in a program that he supervised and that he had the authority to continue her employment with a different source of funding. It is equally clear, moreover, that no exception to the application requirement was made for Ms. Marks. It is true, as Ms. Weisbrot contends, that MCW requires an application for an inter-section transfer and that Ms. Marks ended up working for a subdivision of MCW—the Clinical Research Center—now considered to be a different section than the "Kalkhoff Division." However, Ms. Marks did not transfer to the Clinical Research Center; she arrived at that position through

---

5. In *Anderson v. Baxter Healthcare Corp.,* we summarized the various approaches taken by the circuits in interpreting the Supreme Court's decision in *Hicks.* See 13 F.3d at 1122–23. In *Collier v. Budd Co.,* 66 F.3d 886, 893 n. 11 (7th Cir.1995), we noted that our position is compatible with the prevailing view among the circuits. We note that a divided panel of the United States Court of Appeals for the Third Circuit recently suggested that its current approach, which is essentially the same as our own, ought to be reevaluated. See *Sheridan v. E.I. DuPont de Nemours & Co.,* 74 F.3d 1439 (3d Cir.1996), reh'g en banc granted & op. vacated, Feb. 28, 1996. The competing interpretations of *Hicks* employed by the circuits are also discussed, albeit not in the context of a summary judgment, in the various opinions filed by the judges of the Fifth Circuit in *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (5th Cir.1996) (en banc).

a more circuitous route. As explained in the following paragraphs, the process took two steps and was effectuated by different decisionmakers, acting independently, over the course of several months. MCW policies and procedures were complied with throughout.

*Change in Funding Source*—In 1991, as laboratory work associated with the TOPS research was phased out, Dr. Kissebah assigned Ms. Marks to supervise certain laboratory work in the Endocrine/Metabolic Division and in the Clinical Research Center.[6] Dr. Kissebah supervised both entities; he was Chief of the Endocrine/Metabolic Division and the Principal Investigator of the General Clinical Research Grant. He submitted the necessary paperwork and, as of December 1, 1991, Ms. Marks' salary was paid from the General Clinical Research Center Grant. Ms. Marks' position classification—Laboratory Supervisor—did not change; her employment was continuous. The record is clear, therefore, that this amounted only to a "change in funding source," for which no application is required.

*Administrative Segregation of Accounts*—In March 1992, Ellen Loughran, Assistant Administrator of the Department of Medicine, requested of the MCW Business and Finance Office that all Clinical Research Center grants, which previously had been included in the Endocrine Section, be listed separately as "CRC Division" accounts and separated out from the "Endocrine Division." A similar request was made to the MCW Budget Coordinator in May 1992. Consistent with these directives, a "Source of Compensation" form for Ms. Marks dated July 1, 1992 reflects Ms. Marks as being in the Clinical Research Center Section of the Department of Medicine. It is clear that the division of accounts was effected by Ms. Loughran solely for bookkeeping purposes; it did not affect Ms. Marks' employment in any way. It was not, therefore, the sort of "transfer" that would have required Ms. Marks to submit an application. Thus, it was

through this sequence of events—the "change in funding source" and the administrative segregation of accounts—that Jacqueline Marks came to be classified as an employee of the Clinical Research Center. MCW made no exception to its application policy.

Nor are we persuaded that Ann Schwoerer, the administrative secretary, received more favorable treatment than Ms. Weisbrot upon discontinuation of the TOPS program. As evidenced by the testimony of MCW officials and the number of listings in the "Job Opportunities Bulletin" for persons with secretarial/clerical skills, MCW was experiencing a severe shortage of secretarial help in late 1991 and early 1992. At the time that Dr. Kissebah inquired about Ms. Schwoerer's intention to continue working, he knew that there was a demand for persons with secretarial/clerical skills in the programs he supervised. Under these circumstances, no inference of pretext can be drawn from Dr. Kissebah's offer to place Ms. Schwoerer in an equivalent position.

The record, therefore, fully supports MCW's position that Ms. Marks and Ms. Schwoerer possessed skills and experience that were in demand at MCW—and within areas supervised by Dr. Kissebah—at the time that funding ran out for the TOPS program. Ms. Weisbrot has not identified any vacancy within Dr. Kissebah's authority that she was qualified to fill. Indeed, the record shows that there was no job opening for a Research Technician or a Senior Research Technician in the Endocrine/Metabolic Division from October 1989 through the time Dr. Kissebah made the decision that the position held by Ms. Weisbrot would be eliminated. In his affidavit, moreover, Dr. Kissebah stated that, at the time, he did not anticipate such a position opening up at any time in the foreseeable future.

Dr. Kissebah had no authority to place Ms. Weisbrot in any of the positions listed in the

---

6. In his affidavit, Dr. Kissebah states that there was sufficient demand for a Laboratory Supervisor in the Endocrine/Metabolic Division to enable him to continue the employment of Ms. Marks in that position. He was aware, moreover, from working with Dr. Kalkhoff in the period from 1977 through 1985, and from supervising Ms. Marks' work in 1991, that Ms. Marks had more experience as a Laboratory Supervisor and was more qualified than Ms. Weisbrot to hold that position in the Endocrine/Metabolic Division and in the Clinical Research Center.

"Job Opportunities Bulletin" from September 1991 through February 1992. He did not find a position for Ms. Marks or offer to find a position for Ms. Schwoerer in any division of MCW outside his jurisdiction and control. Under these circumstances, it cannot be said that a younger employee received more favorable treatment than Ms. Weisbrot upon discontinuation of the TOPS program. See *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1392–93 (7th Cir.1990) (rejecting a similar inference when the plaintiff had not come forward to show that she was qualified to fill the positions offered to other employees or that the employer had positions available for persons with her qualifications).

■ As further evidence of pretext, Ms. Weisbrot points to MCW's five-month delay in notifying her that funding for the TOPS program was being discontinued. Had she known earlier that her position was being eliminated, Ms. Weisbrot contends, she would have applied for one of the Research Technician or Senior Research Technician positions that were available during that timeframe. In reply, MCW points to its "general practice" of providing no more than thirty days' notice to employees whose positions were scheduled for elimination due to funding loss. Consistent with this policy, MCW gave Ms. Weisbrot more than a month's notice that her position was being terminated.

■ We note that MCW has produced nothing in writing to substantiate its general practice. Nevertheless, we agree that no rational factfinder could draw an inference of pretext from MCW's delay in providing notice to Ms. Weisbrot. There is no evidence that MCW has ever given a younger employee greater notice that the program funding his or her salary was being terminated. We find it equally significant, moreover, that Ms. Weisbrot was not precluded from applying for employment at MCW during the notice period or after her position was eliminated. Under these circumstances, we are unable to infer from the notice afforded to Ms. Weisbrot that MCW lied about its stated reason for her termination.

Ms. Weisbrot next contends that MCW's handling of her application for a Senior Research Technician position—returning it to her as "not complete"—is evidence of MCW's desire that she not be employed. It is undisputed, however, that the personnel office forwarded her application to those departments seeking a Senior Research Technician in the sixty-day period during which Ms. Weisbrot's application was considered "active." We agree with MCW's position that the extra efforts of its personnel department to help Ms. Weisbrot submit a more complete application do not give rise to an inference that MCW lied about its reasons for her termination.

■ As her final evidence of pretext, Ms. Weisbrot points to a 1991 meeting with Dr. Kissebah in which Dr. Kissebah referred to her as an "older lady." Although she cannot recall the sentence in which Dr. Kissebah used the term "older lady" or the context in which the reference was made, she testified that she was "surprised and shocked" by the remark. R.15, Affidavit of Sabina U. Weisbrot, para. 18. Jacqueline Marks was present when Dr. Kissebah made this remark and testified that it was made in the context of reassuring Ms. Marks and Ms. Weisbrot about moving the office to a different facility.[7]

We agree with the district court's assessment of this remark. The "older lady" reference, viewed in isolation, might demonstrate some sort of bias against older employees. Given the isolated nature of this comment and the positive context in which it was made, no rational factfinder could conclude from this comment that MCW lied about its reason for terminating Ms. Weisbrot. Like the district court, we find the reasoning of *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir.1990), applicable to the present context:

A slur is not in and of itself proof of actionable discrimination, even if repeated. The remark taken to be a slur may have been innocent or misunderstood; or it may have had no consequence, either because it did not reflect the thinking of the people

---

7. Ms. Marks and Ms. Weisbrot apparently had expressed some concerns about relations with personnel at the other facility. According to Ms. Marks, Dr. Kissebah turned to Ms. Weisbrot and explained that "nobody [at the other facility] would be angry with such a nice, older woman." R.12, Deposition of Jacqueline A. Marks, at 55.

with decision-making authority or because it did not motivate even the person uttering it to act on it.

*Id.* at 402 (noting that "the favorable connotations that cluster around the term 'young man' are too tepid to create, in themselves, a triable issue of age discrimination").

As the foregoing discussion makes clear, there is nothing in Ms. Weisbrot's evidence of pretext that could lead a rational factfinder to conclude that MCW lied about its reasons for her termination. Even when this evidence is considered together and in the light most favorable to Ms. Weisbrot, we are not persuaded that there is a triable issue of fact on the issue of pretext. On the record before us, there is simply no reason to believe that Ms. Weisbrot's termination was motivated by anything other than the discontinuation of funding for the TOPS program. Summary judgment, therefore, was properly granted in favor of MCW.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.