**Jimmie HUFF, Plaintiff,**

v.

**UARCO, INC., Defendant.**

**No. 94 C 7585.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 26, 1996.

Order Supplementing Opinion
May 13, 1996.

Charles Drake Boutwell of McCullough, Campbell and Lane, Chicago, IL and John F. O'Meara, Park Ridge, IL, for Plaintiff.

Jeffrey K. Ross and Keri B. Goldstein of Seyfarth, Shaw, Fairweather and Geraldson, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Jimmie Huff ("Huff") has sued UARCO, Inc. ("UARCO"), charging it with age discrimination in violation of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. § 623(a)) (Count I) and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1–101 to 5/10–103 (Count II).[1] UARCO has moved for summary judgment under Fed. R.Civ.P. ("Rule") 56, both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N) and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion

and order, UARCO's motion is granted and this action is dismissed.

### Summary Judgment Standards

■ Familiar Rule 56 standards impose on UARCO the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to Huff (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Huff was treated in a statutorily prohibited discriminatory fashion (*Kirk v. Federal Property Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir.1994)).

■ As in any summary judgment proceeding, this Court accepts nonmovant Huff's version of any disputed facts.[2] What follows, then, is a version of the facts culled from the parties' submissions, with any differences between the two resolved in Huff's favor.[3] Other relevant facts, which fit somewhat better into the substantive legal discussion, will be set out later in this opinion.

---

1. Huff Mem. 4 also refers to asserted disability-based discrimination (see also the in-passing references at *id.* 6, 8). But because Huff did not include such a charge either in his EEOC charge or in his Complaint in this action, any such possible claim is barred.

2. GR 12(M) and (N), which require record references to support the parties' respective factual assertions, are designed to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. For the reason set out in the text, this opinion focuses

on Huff's GR 12(N) responses and his own Statement of Uncontested Facts (respectively cited "P. 12(N) ¶—," and "P. 12(N) Supp. ¶—") and Huff's exhibits (cited "P.Ex.—").

3. One important caveat: a Rule 56 nonmovant's statement of fact or response to the movant's statement will be credited only if the corresponding record citation supports the statement or response. This Court does not have to credit unsupported statements or mischaracterizations of the record.

*Facts*

Huff began his employment with UARCO in the mid to late 1960s, and by 1977 he had risen to the level of supervisor (P. 12(N) Supp. ¶¶ 3, 8). Throughout his UARCO career Huff has worked at its Watseka, Illinois plant, which designs and produces business forms (P. 12(N) ¶ 1; P. 12(N) Supp. ¶ 9).

In October 1993 UARCO's Watseka plant manager Ron Trillet ("Trillet") directed that as part of a cost-cutting effort two of the five line supervisors in the plant's finishing department should be demoted (Williams Aff. ¶ 2; Williams Dep. 21–22; Rhoades Dep. 27; P. 12(N) ¶¶ 2–3; P. 12(N) Supp. ¶ 36). That would leave three line supervisors in the finishing department, a number equal to the three line supervisor positions in the adjoining press department (Williams Aff. ¶ 2).

Trillet asked Richard Rhoades ("Rhoades"), the general supervisor of the finishing department (among others), and UARCO's Watseka director of human resources Robert Williams ("Williams") to make recommendations to Trillet as to which of the supervisors should be retained (Williams Dep. 21–22, 31; Williams Aff. ¶¶ 2–3; Rhoades Dep. 4, 27–28). Huff (then age 56) was one of the finishing department's five line supervisors (P. 12(N) Supp. ¶¶ 3, 37), the other four being Robert Landrey ("Landrey") (age 48), Joel Nasers ("Nasers") (age 48), John Paro ("Paro") (age 54 [4]) and Bill Schoolman ("Schoolman") (age 55) (P. 12(N) Supp. ¶¶ 37–38).

Rhoades responded simply by ranking the five supervisors: Landrey was first, Paro second, Schoolman third, Huff fourth and Nasers fifth (Rhoades Dep. 27–32). Beyond making that initial ranking, Rhoades was not involved in the decision as to which two supervisors to demote (*id.* 31–32).

In preparing to respond to Trillet's request for recommendations on whom to demote, Williams reviewed Rhoades' ranking and interviewed two other general supervisors,

Fred Focken ("Focken") and James Reutter ("Reutter") (Williams Dep. 22–25, 54–55; Williams Aff. ¶ 4). Neither Reutter nor Focken had ever directly supervised Huff (Huff Aff. ¶ 18). Focken, who was general supervisor of the press department and who had occasion to interact with the finishing department supervisors, thought that Huff and Schoolman should be demoted (Focken Dep. 4, 13–14). Reutter did not discuss Huff with Williams, but Reutter (like Focken) said that he felt Schoolman was a poor supervisor (Reutter Dep. 9–10, 18–19, 21–22).

Although Rhoades had effectively recommended demoting Huff and Nasers, Williams expressed the different view that Huff and Schoolman should be demoted. Williams also felt that Nasers and a press department supervisor, Dean Schippert ("Schippert") (age 51), should switch places—Nasers going to press and Schippert to finishing—because although Nasers was poorly ranked as a finishing supervisor, he had previously been considered an excellent supervisor in the press department (Williams Dep. 23–25; Williams Aff. ¶¶ 4–5; Focken Dep. 12; Reutter Dep. 22; Trillet Dep. 80). Williams believed that those decisions would leave the press and finishing departments with the strongest overall management group (Williams Dep. 23–25).

Trillet agreed with Williams' recommendations (Williams Dep. 38). In late October 1993 Huff was demoted from his position of finishing department supervisor to that of a "collator operator"—an hourly non-supervisory position where he operates a jumbo collator machine—a position in which he is still employed (P. 12(N) ¶ 11; Huff Aff. ¶ 20).

*ADEA Claim*

Weisbrot v. Medical College of Wis., 79 F.3d 677, 680–81 (7th Cir.) (most citations omitted) has succinctly set out Huff's burden in this age discrimination action: [5]

---

4. Although P.Mem. 2 and D.R.Mem. 2–3 say that Paro was 56 years old, Paro's employment record (P.Ex. 18) shows his date of birth as 8/23/39. That would have made him 54 in October 1993 (as Williams Aff. ¶ 6 states).

5. *Weisbrot* and other cases speak in terms of an ADEA plaintiff's "establishing" or "proving" his or her claim. In the summary judgment context, of course, plaintiff's burden is the substantially lesser one of demonstrating a genuine issue of material fact. Although this opinion frequently

An ADEA plaintiff may establish age discrimination in one of two ways. She may present direct or circumstantial evidence that age was the determining factor in the adverse employment action, or she may invoke the burdenshifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to create an inference of age discrimination.

Thus an employment discrimination plaintiff such as Huff may travel two "distinct evidentiary paths" (*Kormoczy v. Secretary, HUD*, 53 F.3d 821, 824 (7th Cir.1995)): One will allow Huff to survive summary judgment if he can produce evidence to support a finding of discriminatory intent (the so-called direct method), while on the second Huff can ward off summary judgment if he can outvolley UARCO in the familiar *McDonnell Douglas* ping-pong match (the so-called indirect method). In this case Huff (apparently heeding Yogi Berra's advice: "If you see a fork in the road, take it") has chosen both paths. So this opinion must perforce address each method of proof in turn.

### 1. "Direct" Method [6]

 Via this avenue Huff can survive summary judgment by producing evidence such that a reasonable jury could conclude that he was demoted because of his age. Such proof can be offered in the form of the rare "smoking gun" direct evidence—"evidence that can be interpreted as an acknowledgement of discriminatory intent by the defendant or its agents" (*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)). But because employers generally are not so accommodating as to memorialize their discriminatory animus in writing or to speak it aloud, most commonly a plaintiff will have to rely on circumstantial evidence in the hopes of providing "a basis for drawing an inference of intentional discrimination" (*id.*).

 Of course such circumstantial evidence can take a whole variety of forms, so that any attempt to list here all of the available types of proof would almost certainly fall short (or would one day be proved inadequate by some imaginative lawyer). *Troupe, id.* (citations omitted) has outlined the most commonly employed types of circumstantial evidence of intentional discrimination:

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.... Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment [7].... Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

But it is important to keep in mind that Huff must produce at least enough evidence, whether direct or circumstantial, so that a reasonable jury could infer that he was demoted because he was a member of a protected class (*id.* at 737).

Although Huff labels a section of his memorandum (P.Mem. 12) "Direct Evidence of Age Discrimination," there is nothing in the

---

employs the other locution, both to conform to the case law discussion and to avoid the awkward constant repetition of the longer formulation, this Court has of course adhered to and applied the lesser Rule 56 burden.

**6.** "Direct" is placed in quotes here in an attempt (admittedly a feeble one) to avoid the confusion that is frequently engendered by the dual role played by the word "direct" in this area of the law. As already stated, a plaintiff can establish intentional discrimination "directly" by producing evidence of discriminatory intent or "indi-

rectly" by using the burden-shifting analysis of *McDonnell Douglas*. And confusion results because within the so-called "direct" method a plaintiff can of course produce either direct or circumstantial *evidence* of intentional discrimination (see, e.g., *Kormoczy*, 53 F.3d at 824).

**7.** [Footnote by this Court] See the Appendix for an explanation of this opinion's omission of any direct discussion of what *Troupe, id.* went on to list as a third type of circumstantial evidence of discriminatory intent.

record that could be characterized as direct "smoking gun" type evidence (a statement acknowledging a discriminatory motivation behind to the decision to demote Huff, such as "We're demoting Huff because he is the oldest supervisor in the finishing department"). In terms of circumstantial evidence, Huff attempts to demonstrate that UARCO (and specifically Trillet) was engaged in a "plot to eliminate the older workers" (P.Mem. 13). First, Huff points to statements by UARCO officials, including Trillet, made during meetings where UARCO was discussing or negotiating a collective bargaining agreement with the Danville Printing and Graphic Communications Union No. 257C ("Union"), which represents the machine operators in UARCO's press department (P. 12(N) Supp. ¶¶ 188–96, 198–204; P.Ex. 35–36). Second, Huff refers to UARCO's violation of the seniority-based contractual recall rights of several non-supervisory Union employees after they had been laid off.

UARCO correctly responds that Huff's attempt to prove discriminatory intent by referring to statements made during collective bargaining negotiations between UARCO and Union is a red herring. For one thing, none of the statements made and events recorded in the minutes and handwritten notes of those meetings has anything at all to with the decision to demote Huff or any other supervisors—instead all relate to non-supervisory Union personnel in the context of meetings and negotiations about the seniority rights of Union employees (see *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir.1993); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 n. 44 (7th Cir.1992)). Further, many of the statements (P. 12(N) Supp. ¶¶ 192–94, 196, 198, 202, 204) were made by people not involved in the decision to demote Huff (see *Rush, id.*) or are so far afield or so difficult to interpret that they cannot fairly be said to shed any light whatever on the decision to demote Huff (P. 12(N) Supp. ¶¶ 189–93, 199, 201–02, 204).

Most importantly, when taken in context, those comments simply do not support a reasonable inference that UARCO (or even Trillet alone) was engaged in a pattern of age-discriminatory activity (thus creating an inference of age-discriminatory intent that would spill over to Huff's situation). Much of the negotiation between UARCO and the Union centered around the problem of what rights press department employees with greater seniority should have in terms of their right to "bump"—or replace—active but less senior employees in a layoff situation. One of UARCO's main concerns revolved around the extent to which a senior employee who worked on one class of equipment could bump a junior employee working on a different class of equipment.[8] In such a case UARCO would have to incur additional expenses in training a senior employee to do a job that a junior employee was already capable of doing (P.Ex. 71 at 43; P.Ex. 77 at 1–3; P.Ex. 78 at 46–47).

 Thus, especially when viewed in context, there are three reasons why the statements by Trillet and other UARCO officials (P. 12(N) Supp. ¶¶ 188, 194, 196, 198, 200 and 203; see also *id.* ¶ 195) are simply not evidence from which a reasonable jury could infer that Huff's demotion was discriminatorily motivated:

1. They do not show a motivation to treat older employees adversely, but rather reflect UARCO's legitimate desire to structure a seniority system in a cost-effective manner[9] (see *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir.1995), stating "an employer incurs no duty to transfer an employee to another position when it reduces its work force for economic reasons").

---

8. Apparently there are five different classes of equipment in UARCO's press department—Offset, New Era, Rotary P.S., Propheteer and Register (see P.Ex. 35 at 6; P.Ex. 36 at 8). UARCO's current collective bargaining agreement with Union establishes a seniority, layoff and recall system based in large part on the class of equipment on which the employee works (P.Ex. 36 at 9–11).

9. For example, Trillet stated (P. 12(n) Supp. ¶ 200) of the more senior workers:

> [T]hey have a lot of seniority but they can't operate the Rotary P.S. label presses without training and the junior men have the skill and training that we need right now. Also we need to think about the future, and some of these more senior guys wouldn't be around that long even if we did train them.

2. Importantly, Huff's attempted over-emphasis on decisions and statements that take seniority into account is at odds with the teaching of *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) that such aspects of an employer's activity are not as such age-discriminatory, even though they may have a greater adverse impact on older employees.

3. At any rate, it just requires too much of a stretch to suggest that those statements—made during consideration of Union employees' seniority rights to be recalled or bumped to different types of equipment—could be used to infer that Huff's demotion was discriminatorily motivated.

In short, what Huff attempts to rely on here is an impermissibly far cry from the statements made in a case that he tries to call to his support, *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 115–16 n. 3 (7th Cir.1986) (overruled in another respect, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir. 1988)). And relatedly, any even arguable connection between UARCO's asserted violation of Union employees' seniority based recall rights (discussed at P.Mem. 4–6) and Huff's demotion is also far too tenuous to support Huff's age discrimination claim [10]—especially in light of the lack of any other evidence.

This Court's duty is to look at the record and determine whether Huff has met his burden of showing that there is enough evidence for a reasonable jury to conclude that Huff was demoted because of his age. But the *only* arguably relevant evidence [11] that Huff has produced revolves around the seniority, bumping and recall rights of non-supervisory Union employees—and even if that evidence could cause one to question UARCO's handling of that situation, it certainly does not suffice to raise a genuine issue of material fact as to Huff's demotion. This Court therefore holds that a reasonable jury, having been given that information, would simply not be able to infer that Huff was the victim of age discrimination.

*2. McDonnell Douglas*

 As stated earlier, an employment discrimination plaintiff who cannot directly prove intentional discrimination is not out of luck *if* he or she can successfully navigate *McDonnell Douglas.* Under that well-established framework, Huff must first establish a prima facie case by showing [12] that (1) he was in the protected age class, (2) he was performing his job satisfactorily, (3) he suffered an adverse employment action and (4) younger employees were treated more favorably (*Roper v. Peabody Coal Co.*, 47 F.3d 925, 926 (7th Cir.1995)).[13] If he succeeds in that

---

**10.** For present purposes, D.R.Mem. 10 n. 9 does not dispute that UARCO violated the contractual recall rights of several more senior Union employees (by transferring five younger employees into openings in the press department rather than recalling the older laid off Union members). But it has not conceded that it did so for age-based reasons, and it has advanced what could qualify as "legitimate, nondiscriminatory" reasons for its actions (*id.;* P.Ex. 34 at 1–3). This Court is of course bound to grant Huff the benefit of all reasonable favorable inferences. But UARCO's R.Mem. 10 n. 9 also explains plausibly:

> The less senior employees who had been transferred into job vacancies in the specialty label press department were current, active employees at the time (Pl.Exs. 45–53). It was therefore easier and more cost-efficient for UARCO to transfer employees on the payroll into these vacancies rather than rehire people who had been previously laid off. Thus, even assuming the senior employees' recall rights were violated, it was not because of any age-related reason.

Even with the inferential benefit to which Huff is entitled, a jury would not reasonably be able to infer from those transfers an intent to discriminate against Huff—even more so because of the fact that the record indicates that the transfer of each of the younger employees into the press department (discussed at P.Mem. 5) took place anywhere from 10 to 20 months *after* Huff was demoted (P. 12(N) Supp. ¶¶ 153–86).

**11.** To be sure, Huff has not left this Court with a shortage of quite irrelevant evidence or wholly unsupported speculations (e.g., his reference to "Trillet's crusade against the disabled" (P. 12(N) Supp. ¶ 203)).

**12.** See n. 5.

**13.** Earlier this month *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1309–10, 134 L.Ed.2d 433 (U.S.) confirmed definitively—in line with existing Seventh Circuit precedent (see *Roper*, 47 F.3d at 927)—that an ADEA plaintiff need not show that the

showing, the burden of production (though not of proof) shifts to UARCO to articulate a "legitimate, non-discriminatory" explanation for the adverse employment action (*id.*). Finally, if UARCO meets that burden Huff must then show that UARCO's stated and facially legitimate reasons for its action were a mere pretext for age discrimination (*id.*).

■ At least on the current motion UARCO has conceded Huff's ability to establish a prima facie case (D.Mem. 3). That concession permits immediate recourse to what so frequently makes sense in these actions without "dancing through the *McDonnell Douglas* quadrille" (*Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990))—that is, an examination of UARCO's stated reasons in pretext terms.

Huff does not contend that UARCO's plan to eliminate two line supervisor positions was itself discriminatory (see P. 12(N) ¶ 3). Instead he challenges UARCO's decision to demote him rather than one of the other supervisors. As the *Facts* section reflects, UARCO's stated reason for that action is simply that Huff was regarded as one of the two weakest supervisors of the five and that UARCO understandably wanted to retain the supervisors that it felt would leave it with the strongest management team—clearly a facially legitimate, nondiscriminatory explanation.

■ Pretext "means a lie, specifically a phony reason for some action" (*Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). In that respect it is important to remember that the ADEA does not allow courts to act as roving personnel departments and to second guess the good faith business judgments of employers (see, e.g., *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th Cir.1989)). Instead what controls is the "perception of the decision maker" (*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337–38 (7th Cir.1991)) and whether that decision maker "honestly believed in the reasons [he] has offered for [his] actions" (*McCoy*, 957 F.2d at 373).

One of Huff's main contentions has to do with the fact that Williams (in making his recommendations) and ultimately Trillet (in making his demotion decisions) utilized input from other sources, rather than relying solely upon the evaluations by Rhoades (who was Huff's direct supervisor). But it is beyond question that Rhoades too ranked Huff fourth out of the five line supervisors in the finishing department.[14] So even if Rhoades' recommendation alone had been followed, *Huff would still have been demoted.* Indeed, there is no record evidence that Trillet or Williams was somehow obligated to follow Rhoades' recommendations (something that might be relevant if Schoolman rather than Huff were the plaintiff here).

■ Huff relatedly challenges Williams' qualifications to make a decision as to the capabilities of supervisors (P.Mem. 1 n. 2, *id.* 11). That contention is empty for more than one reason. For one thing, it is undisputed that human resources manager Williams looked at Rhoades' rankings and interviewed two other supervisors—Focken (who suggested demoting Huff and Schoolman) and Reutter (who did not discuss Huff but suggested demoting Schoolman)—before Williams made his recommendation. Most importantly, it is not this Court's function to probe into whether Trillet should have ap-

---

employee given more favorable treatment was not in the protected class (under the age of 40):

> [ADEA] does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.

That means Huff's ADEA claim is not foreclosed by the fact that all of his fellow supervisors in the finishing department were also over 40. But the fact that their ages were all quite closely clustered—56 (Huff), 55 (Schoolman), 54 (Paro) and 48 (Landrey and Nasers)—certainly does not ease Huff's burden (as *Roper*, 47 F.3d at 927 put it, "The disparity in age within the protected class must be sufficient to create a reasonable inference of age discrimination"; accord, *O'Connor*, ―― U.S. at ――, 116 S.Ct. at 1309–10).

14. Because it is undisputed that Rhoades did rank Landrey first, Paro second, Schoolman third, Huff fourth and Nasers fifth, Huff's arguments based on the disappearance or destruction of Rhoades' written rankings (P.Mem. 10) are irrelevant.

pointed someone arguably more qualified to make the recommendation, or whether other departments should also have been considered (P.Mem. 2–3), or whether Huff should have been made a supervisor of another department (P.Mem. 3 n. 4, *id.* 4 and 11–12) or whether Nasers and Schippert should have been switched (P.Mem. 3). Rather the relevant inquiry is whether the decisionmaker (here Trillet), or perhaps Williams (in providing his input to Trillet), "honestly believed in the reasons" that he offered (*McCoy*, 957 F.2d at 373)—and there is no evidence that such was not the case.

■ Huff also urges that UARCO violated a company policy by not using seniority as the sole basis for the demotion decision. While it is of course true that a company's deviation from its own procedures may be evidence of pretext, here Huff's contention must fail because there is no basis in the record to support an inference that it was UARCO policy that seniority as a supervisor was to be the sole basis for supervisory demotions.[15] Rhoades testified that seniority plays "[l]ittle if any" role in the demotion of supervisory or management personnel (Rhoades Dep. 17), and Trillet said that seniority was only one of several factors that could be considered in such a demotion (Trillet Dep. 100–01). Even Huff himself acknowledged that he was not aware of *any* type of employment decisions that are based on years of service as a supervisor (Huff Dep. 20; see also *id.* 18–19).[16] And Huff's effort to recast UARCO's Industrial Relations Manual ("Manual," P.Ex. 2) as requiring that seniority as a supervisor is to be the sole criterion for supervisory demotions is dead wrong—nothing in that Manual states that, and the provision on which Huff attempts to rely applies solely to layoffs by its own terms (*id.* at 67–71).[17] Nor is there any

evidence to support Huff's interpretation—in fact, it is flatly contradicted by the Rhoades–Trillet (and even Huff) testimony.

When all the smoke clears, there is really nothing to support Huff's charge (a recurrent theme throughout Huff's response to UARCO's motion) that Trillet (or Williams) violated UARCO policy by not using seniority as the sole basis for the decision. Huff's questionable parsing of Trillet's deposition does not begin to fill that void (P.Mem. 3–4, 9).

■ If cases were decided based on the thicknesses of the parties' submissions, Huff—with a four-volume appendix spanning roughly 1,000 pages—would win this one by a paperslide. But here the summary judgment principle against the "weighing" of evidence hurts rather than helps Huff. When the *material* evidence is considered, no reasonable jury could conclude that UARCO's explanation for demoting Huff was anything but an honest one. Despite his voluminous submission of nonmaterial (that is, non-outcome-determinative) matters, Huff has not even come close.

*IHRA Claim*

■ UARCO's Mem. 8 n. 3 challenges Huff's ability to bring a claim under IHRA, citing *Perera v. Flexonics, Inc.,* 727 F.Supp. 406, 409 (N.D.Ill.1989) for the aggrieved party's need to exhaust administrative remedies before going to court. Even in the Illinois courts no judicial review is available under IHRA unless the Illinois Human Rights Commission ("Commission") has issued a final order on a plaintiff's complaint (*Flaherty v. Gas Research Inst.,* 31 F.3d 451, 458 (7th Cir.1994))—and Huff has presented no evidence that such a final order has been is-

---

**15.** Because it is undisputed that Huff had the *least* seniority as a UARCO employee of any of the five supervisors in the finishing department (P.Mem. 2), Huff's seniority argument can be based only on his seniority as a supervisor—where he ranked third out of five (*id.*).

**16.** Huff's statement that "UARCO supervisors testified that seniority was the sole criteria for demotion" (P. 12(N) Supp. ¶ 42) is misleading—

in each instance those supervisors were referring to non-supervisory personnel (Paro Dep. 29; Krones Dep. 9–10; Focken Dep. 40–45; Trillet Dep. 100).

**17.** In addition, the Manual's introductory section (*id.* at 1–2) states that the Manual is to serve as a guide to be used *by* supervisors in dealing with employees. There is no evidence that the guide's layoff procedures apply to supervisors.

sued.[18] Therefore Huff's claim must be dismissed for, at a minimum, his failure to exhaust the administrative remedies provided by IHRA (*id.* at 459).

### Conclusion

UARCO has met its burden of establishing that there is no genuine issue of material fact as to Huff's age discrimination claim, and it is entitled to a judgment as a matter of law. This action is dismissed.

### Appendix

In addition to the two kinds of circumstantial evidence of discriminatory intent discussed in the text of this opinion, *Troupe,* 20 F.3d at 736 also spoke of another:

> And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

That however really seems to be simply a shorthand way of describing the *McDonnell Douglas* burden-shifting analysis. In *Troupe,* now Chief Judge Posner was attempting to clarify confusion caused at least in part by the dual use of the term "direct" (see this opinion's n. 6), because in that case the District Judge had mistakenly held that under the "direct" method of proving intent a plaintiff must use direct evidence. *Troupe* clarified that circumstantial proof is certainly an acceptable way to prove intentional discrimination. Indeed, except for a very small category of "truly direct evidence," almost all of the ways in which a plaintiff can create a triable issue of intentional discrimination really involve circumstantial proof—the "indirect" *McDonnell Douglas* method included (*Troupe,* 20 F.3d at 736; see also *Iovin v.*

*Northwestern Memorial Hosp.,* 916 F.Supp. 1395, 1405–06 (N.D.Ill.)).

But once *Troupe* made the distinction between direct and circumstantial evidence, it never returned to the more-often-cited distinction between the "direct" and "indirect" methods of proof, possibly because the "indirect" *McDonnell Douglas* method was clearly not available to the plaintiff in *Troupe* (see 20 F.3d at 736–37). There is nothing to suggest that *Troupe* in any way disapproved of that core dichotomy—on the contrary, its citation to *Ayala v. Mayfair Molded Prod. Corp.,* 831 F.2d 1314, 1318 (7th Cir.1987) (which specifically discussed the "two methods of proof": the "direct method" and the "indirect method, the burden shifting analysis set forth in *McDonnell Douglas*") dispels any such notion. And because post-*Troupe* cases such as *Weisbrot,* 79 F.3d at 680–81, and *Kormoczy,* 53 F.3d at 824 continue to frame employment discrimination cases by treating *McDonnell Douglas* as a separate method of proof rather than as a subcategory of circumstantial evidence, this opinion has done the same (see also *Piraino v. International Orientation Resource,* n. 7 (N.D.Ill. May 26), making a similar point).

Unfortunately some post-*Troupe* opinions (see *Kormoczy,* 53 F.3d at 824; *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 669 (7th Cir.1995)) have added (or, perhaps more accurately, restored) some confusion to the mix by simply citing to or quoting the language in *Troupe* that refers to the "three types of circumstantial evidence," without recognizing or pointing out that the third type of circumstantial evidence discussed in *Troupe* is really a summary restatement of the "indirect" *McDonnell Douglas* method of proof. It is worth noting that *Kormoczy* and *Hill* really wind up treating the *McDonnell Douglas* framework in a redundant fashion (see *Kormoczy,* 53 F.3d at

---

**18.** One added problem for an employee such as Huff seems to have escaped discussion in the federal cases in this area. IHRA's provisions allowing private parties to bring court actions based on the violation of state-declared civil rights extend only to post-Commission judicial review in the Illinois Appellate Court (775 ILCS 5/8–111(A)) and to enforcement of Commission orders in the Illinois Circuit Courts (*id.* 5/8–

111(B)). All other state court jurisdiction is expressly negated (*id.* 5/8–111(C)). It would therefore appear that even after a party has exhausted all administrative remedies, a losing grievant could claim no ticket of entry to a federal district court either, while the relief (if any at all) that is available to a successful grievant could at most be the enforcement of what the Commission had granted.

823–24, in one paragraph stating that *McDonnell Douglas* is a "distinct evidentiary path[ ]" but then, by citing to *Troupe's* "three categories for circumstantial evidence" in the next paragraph, unwittingly including it as a subcategory of the "direct" method; *Hill,* 67 F.3d at 669).

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

It is an ancient truism that "No one should be judge in his own cause." [1] Or as Pope put it in his more colorful metaphor:

All things are yellow to the jaundic'd eye. [2]

In today's business world those truisms are too often evidenced in employment discrimination litigation, where (as here) an employee who is in the age-protected category under ADEA ascribes every adverse decision by his employer to the fact that the employee *is* in that category, refusing to accept the truth that he was just not as good as the employees who were preferred over him.

Just so, in this lawsuit Jimmie Huff ("Huff") has tried everything to deflect attention from the inexorable facts (1) that two out of five supervisors in the UARCO, Inc. ("UARCO") finishing department had to be demoted as part of a cost-cutting measure and (2) that Huff was ranked as one of the bottom two of those five supervisors by *each* of the people who evaluated all the supervisors and made their recommendations to plant manager Ron Trillet ("Trillet," who was required to make the demotion decision). Having lost as the result of this Court's careful review of all of the evidence on Uarco's Fed.R.Civ.P. ("Rule") 56 summary judg-

ment motion, Huff now asks that this Court reconsider, under Rule 59(e), the decision that it announced in its April 26, 1996 memorandum opinion and order (the "Opinion").

There are three related reasons for rejecting Huff's efforts to return to square one in this litigation. Separately and together, they require the denial of his motion.

First, this Court has often repeated the insightful characterization by Judge Dortch Warriner in *Above the Belt, Inc. v. Mel Bohannan Roofing Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983):

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

Or as this Court has said (perhaps more pungently, but with equal accuracy) in *Quaker Alloy Casting Co. v. Gulfco Inds., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988):

> [T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions such as this reflect a fundamental misunderstanding of the limited appropriateness of motions for reconsideration. [3]

Here Huff fails to meet either *Above the Belt* standard (or the *Quaker Alloy* criticism), for he has offered nothing this time

---

1. Publilius Syrus, *Maxim* 545.

2. Alexander Pope, *Essay on Criticism,* pt. 2, line 359.

3. [Footnote by this Court] Perhaps unsurprisingly, other District Judges have found occasion to echo that criticism—see, e.g., among the cases spotted in a quick Shepardizing of *Quaker Alloy* in this District, *Reich v. Local 134,* 95 C 6688, 1996 WL 210071, at *1 (N.D.Ill. Apr. 26) (one of several by Kocoras, J.), *Ventre v. Datronic Rental Corp.,* 92 C 3289, 1996 WL 66115, at *3 n. 1 (N.D.Ill. Feb. 13) (Coar, J.), *Jones v. Julian,* 94 C 5571, 1996 WL 65993, at *1 (N.D.Ill. Feb. 12)

(Plunkett, J.), *United States ex rel. Emerson v. Gramley,* 902 F.Supp. 143, 145 (N.D.Ill.1995) (one of several by Aspen, C.J.), *United States ex rel. Felder v. Gramley,* 893 F.Supp. 768, 773 (N.D.Ill.1995) (one of several by Moran, C.J.) and *Rhone–Poulenc, Inc. v. International Ins. Co.,* 877 F.Supp. 1170, 1173–74 (N.D.Ill.1995) (one of several by Conlon, J.); and in other districts, *RTC v. Holmes,* 846 F.Supp. 1310, 1316 n. 19 (S.D.Tex.1994); *Texas Instruments, Inc. v. Micron Semiconductor, Inc.,* 815 F.Supp. 994, 996 (E.D.Tex.1993); *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991) (Schwartz, J.); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (Longobardi, C.J.).

that he did not offer and that this Court did not consider the first time around. Perhaps Huff has rephrased his contentions somewhat, but they are really the same stuff clothed in only slightly different garb.

Second, the things to which Huff points were not only presented to this Court before, but they have already been found wanting in the Opinion. This Court waded through all of Huff's bulky submissions in the course of ruling on UARCO's summary judgment motion (see Opinion at 8–12). There is nothing in any of the matters that Huff has recited that constitutes direct evidence of UARCO's age discrimination *against Huff*—nor does any of the material that he again proffers create a reasonable inference of such discrimination *against Huff.*

■ Third and relatedly (indeed, perhaps an important variant on the point just made), Huff has ignored entirely the essential element of causation, which is the reason for this Court's repeated emphasis of the "against Huff" language in the preceding sentence. It is of course true that in general an employee can point to an anti-age (or, say, anti-black or anti-female) bias on an employer's part to create an inference that the employer's decision adverse to that employee was born of its intent to discriminate against him or her *because of* the employee's age (or race or sex). But it takes only a brief discussion to see why in this instance Huff cannot seek to rely on such an analysis.

Let it be assumed arguendo (by stretching the evidence that has been tendered by Huff) that Trillet had, in the different context referred to in the Opinion, made statements that could arguably be characterized as age-discriminatory.[4] But even on that assumption Huff ignores entirely (as he must in order to make his argument) the devastating

fact that *all* of the input provided to Trillet for his use in reaching his decision placed Huff in one of the bottom two rungs, hence identifying Huff as one of the two supervisors who should be slated for demotion.[5] Yet as Huff would have it, if Trillet had not been possessed of the claimed anti-age animus he would have (or he *should* have?) ignored the unanimous recommendations of his subordinates and spared the one person that everyone put at the bottom of the barrel: Huff.

■ That is of course arrant nonsense. Although this analogy did not become heightened until Huff rang the changes on his argument in the current motion, the situation if Huff were to be taken on his own terms is very much akin to the unanimous view of the Justices in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989): If an employer has two reasons for treating an employee adversely, one of them being fueled by prohibited discrimination and the other being an independent business reason, the employee cannot recover if the same adverse decision would have been reached even if the employee had *not* been older (or had not been a black or a woman).[6] Here that is overwhelmingly clear—Huff has not offered a shred of evidence that, even with the required reasonable inferences in his favor, creates a genuine factual dispute on that score.

In summary, no amount of revisiting of the evidence calls for a conclusion different from the one reached in the Opinion. Huff's Rule 56(e) motion must be and is denied.

---

4. On that score, however, contrast the Opinion's review of those matters with the spin that Huff seeks to create in his current motion. What has been said about perspectives at the outset of this opinion provides a clue to the difference.

5. Even though the persons who provided that input to Trillet differed as to the identity of the second supervisor who should be coupled with Huff in those two bottom rungs, *no one* differed as to placing Huff in the discard pile.

6. Although the Court was splintered in *Price Waterhouse* as to where the burden of proof should lie in such "mixed-motive" situations (see *id.* at 258 (four-Justice plurality opinion), 261 (Justice White's concurrence), 276 (Justice O'Connor's concurrence) and 295 (three-Justice dissent), 109 S.Ct. at 1794–95, 1796, 1804, 1814), all of the Justices subscribed to the principle just stated in the text.