**Robert O'CONNOR, Plaintiff–Appellant,**

v.

**DePAUL UNIVERSITY, Defendant–Appellee.**

No. 94–2683.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1997.

Decided Sept. 2, 1997.

Rehearing Denied Oct. 6, 1997.

Robert O'Connor, Chicago, IL, pro se.

Joan E. Gale, Staci A. Stobart (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

·Wayne W. Whalen (argued), Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Amicus Curiae.

Before FLAUM, KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Robert O'Connor was employed as a carpenter by DePaul University from 1986 until he was discharged in June of 1993. Alleging that he was terminated unlawfully on the basis of his age, O'Connor sued DePaul under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). The district court granted summary judgment in favor of DePaul, and O'Connor appeals. Because O'Connor has failed to raise a factual question as to DePaul's discriminatory intent, we affirm.

## I.

The events leading up to O'Connor's termination in June of 1993 took place during the winter and spring of that year and involved several employees in the physical plant department at DePaul's Lincoln Park Campus in Chicago. O'Connor's direct supervisor was head carpenter Thomas Hojnacki, who in turn reported to Robert Riggs, the "Physical Plant Manager for Trade Services." O'Connor's discharge (at least as explained by De-Paul) arose out of his relationship with Jill Fritchen, who in June of 1993 was the "Physical Plant Manager of Custodial Services" at DePaul. Although the record does not say so, the titles suggest that Fritchen and Riggs were peers at the level of manager. Both reported to Mark Nuter, the "Director of Physical Plant" for the Lincoln Park Campus. Acquainted since Fritchen became the office manager for the physical plant department in 1987, Fritchen and O'Connor had no social relationship or other contact outside of their employment at DePaul.

In February 1993, O'Connor began writing letters to Fritchen, who was then approximately six months pregnant with her first child. O'Connor explained that his initial letter was intended to offer "motivation and support" to Fritchen, which he believed she might need "[b]ecause of all the rumors that were going around campus" relating to her being pregnant and not married. (O'Connor Dep. at 54.) He stated in the letter that he had thought she was "cold and unfeeling and only interested in her job until [he] realized she was going to keep her baby." (*Id.*) Fritchen telephoned O'Connor after receiving the letter. Although she sobbed in the course of this conversation, O'Connor did not perceive that his letter had upset her. On March 19, O'Connor attended a baby shower thrown for Fritchen by her colleagues. He gave her a diaper bag, bottles and several other small items for the baby. Fritchen thanked O'Connor for the gift in a short note, which also expressed gratitude for "your words here and there of support and 'fatherly advice,' and all the encouragement you've shown me." (O'Connor 12(n) Ex. 6.) On April 16, O'Connor left a bag on Fritchen's desk that contained two books and a poem about motherhood, along with two personal letters that he had written to her.

Three days later, on April 19, Fritchen met with Riggs to complain about the letters and gifts she had received from O'Connor. Riggs offered to intervene, but Fritchen said that she wished to handle the matter herself, and she did so by talking to O'Connor later that day. As O'Connor recalls this meeting, however, Fritchen did not express displeasure with his gestures, but rather thanked him effusively for his support. O'Connor does remember that Fritchen asked whether he "[w]ould be upset if [she] asked [him] not to write." He asked why she wanted him to stop, and she responded by saying "I don't even really know you." (O'Connor Dep. 46–48.)

Notwithstanding this discussion, O'Connor left Fritchen a card and some cash after she got married on April 30, and Fritchen again responded with a note of thanks. Fritchen subsequently gave birth to her child and took a six-week leave of absence from DePaul. She returned to work on June 28 and received another package from O'Connor the very next day. This one contained four let-

ters that O'Connor had written to Fritchen during her leave, three books, a card, and some money. One of the letters, dated May 26, merits partial quotation here because it belies O'Connor's asserted unawareness that his actions bothered Fritchen or that she wanted him to stop:

I know I said I wouldn't send you any more letters and I did intend to honor your request, but I couldn't let your wedding, Mothers Day and the birth of your baby pass without sending along a couple words of recognition and support. I think they are noteworthy events that deserve comment and I hope you accept my words within the positive framework in which they were written.

Please don't be angry or upset with me for these latest "installments." I know what I promised. I had the need to communicate these thoughts, to get them out, and I didn't see any other outlet.

\* \* \*

I ask for your indulgence, your forbearance and your understanding in this matter, this one time. I offer my apology if anything I have ever said or done has hurt your feelings, caused you embarrassment or offended you in any way. I guess even the best of intentions can become irksome. Once again, I ask you not to be too severe with me. I don't think I would like to incur your wrath or earn your animosity. I am promising you (Have your heard that before?) now, that these will be the end of the letters—honest!

\* \* \*

Another reason I won't write anymore is that you asked me not to, and I really do want to honor your request. Honestly, though, I am a little hurt that they could make you feel uncomfortable or uneasy. I, myself, don't think they contained anything improper or inappropriate.... The fact that you prefer not to have them, however, for whatever reason, is sufficient enough for me to desist.

\* \* \*

Well, Jill, I thank you for being a good sport to endure "these things" even though I know you feel skeptical about them, or me or both. Just read them and throw them away. Hopefully, you will come away with a kind thought for me, instead of biting my head off for the broken promise.

(O'Connor Dep. Ex. 1.) Another of the letters included in the June 29 package, this one dated May 18, discussed the concern that O'Connor had experienced during Fritchen's pregnancy. He wrote:

I am happy for you that the waiting is over and both of you are healthy. I am relieved for myself, for now I no longer have to worry about the status of mother and child.... Really, Jill, the anxiety was beginning to get to me a bit.

\* \* \*

I had a nightmare of you falling on the ice, which left me a bit unsettled. That may help to explain my obsessive concern about your welfare.

(O'Connor 12(n) para. 23.)

Upon receiving the June 29 package, Fritchen again complained, this time to both Riggs and Nuter. At their request, she prepared a memorandum addressed to Riggs that detailed the situation. She told of the first letters and of her meeting with O'Connor, stating that she "told him that I wanted this correspondence to stop because it was uncomfortable for me and, I felt, totally inappropriate." She continued:

This morning when I arrived at my office, there was a bag of books and letters along with a card that were addressed to me from Bob O'Connor. At this point, I have no choice but to come to you, his manager. Apparently, my request that he cease and desist from acting in this manner has fallen on deaf ears. I stand by my belief that this is very inappropriate behavior in the workplace, particularly given the personal nature of his letters, when we have no personal relationship between us. Please address this issue as you see fit. Apparently, I cannot resolve it myself.

(DePaul Ex. 2.) Later that day, O'Connor was summoned to a meeting with Nuter, Riggs and Hojnacki. The three confronted O'Connor about his gifts and letters to

Fritchen, who they said had been upset by his·behavior. O'Connor acknowledged that he had left the items but claimed to be unaware that his conduct was unwanted or inappropriate. O'Connor asked that Fritchen join the meeting, but Riggs told him that Fritchen was afraid of him. Riggs also noted a previous instance in which O'Connor had written a series of apparently unwanted letters to another DePaul employee, Denise Omerick.

·After O'Connor refused to resign, Riggs told him that he was being terminated for "sexual harassment." Riggs confirmed the discharge in two subsequent letters. Both letters were dated June 29 and both were addressed to O'Connor, but each justified the dismissal in slightly different terms. The letter that was given to O'Connor stated that "[b]ecause of insubordinate activities on your part which you were previously advised to cease, and clearly did not, you are hereby terminated from employment...." (O'Connor 12(n) Ex. 8.) The other letter, which was placed in O'Connor's personnel file, stated that O'Connor had been fired "due to the continued harassment of an employee of the Lincoln Park Campus Physical Plant management staff, after you were advised to cease and desist by this employee." (O'Connor 12(n) Ex. 9.) Shortly after O'Connor, then 43, was terminated, DePaul hired 32–year–old John Korenic to replace him. In December 1993, O'Connor filed this suit in federal district court alleging that his discharge was based on age and constituted unlawful discrimination in violation of the ADEA.[1]

## II.

■ We review the district court's grant of summary judgment *de novo*, and in so doing we construe the evidence and all inferences that reasonably can be drawn there-

from in the light most favorable to the non-movant, here O'Connor. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). We will affirm the grant of summary judgment only if the evidence reveals "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The ADEA prohibits discrimination in employment against individuals who are forty or more years of age. 29 U.S.C. §§ 621(b), 631(a). A plaintiff seeking relief under the Act must show that "she would not have been treated adversely by her employer 'but for' the employer's motive to discriminate against her because of her age." *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 680 (7th Cir.1996); *see also Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996). When, as here, there is no direct evidence of discrimination, the employee may attempt to show discrimination by way of the burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, e.g., *Kaniff v. Allstate Insurance Co.*, 121 F.3d 258, 265 (7th Cir.1997); *Weisbrot*, 79 F.3d at 680–81.

■ The parties do not dispute that O'Connor has made out a prima facie case of discrimination. He was 43 years old at the time of his termination, he was performing his job satisfactorily, he was discharged from employment, and he was replaced by a younger employee.[2] Nor is there any question that DePaul has articulated a non-discriminatory reason for the discharge. DePaul maintains that O'Connor was dismissed because of his behavior toward Fritchen and his refusal to desist after she had asked him to do so. As is often the case, then, the dispute comes

---

1. After his attorney withdrew from the case, O'Connor elected to proceed pro se before this court. An amicus curiae was appointed to address the questions raised by O'Connor's appeal. The court is grateful for counsel's very helpful assistance.

2. Under the Supreme Court's decision in *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S.

——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996), the plaintiff need not show that the employee who replaced him does not belong to the protected class, although 32–year–old Korenic met that condition. *See also Leffel v. Valley Financial Services*, 113 F.3d 787, 792–94 (7th Cir.1997); *Denisi*, 99 F.3d at 864.

down to the final step in the *McDonnell Douglas* analysis, when the burden shifts back to O'Connor to show that the reason proffered by DePaul was actually a pretext for discrimination. As we explained in *Denisi*, 99 F.3d at 865, an employee may survive a motion for summary judgment that rests on the issue of pretext by

> "produc[ing] evidence from which a rational factfinder could infer that the company lied about its proffered reasons for his dismissal," *Courtney v. Biosound, Inc.*, 42 F.3d 414, 424 (7th Cir.1994), or that the company's proffered reasons do not represent the truth, *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir.1995).

*See also Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995) (Defendant must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the discharge, or (3) that they [the reasons] were insufficient to motivate [the] discharge." (citations and internal quotations omitted)). If the employee succeeds in casting doubt on the proffered reason for the dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider. *Weisbrot*, 79 F.3d at 682 (citing *Courtney v. Biosound, Inc.*, 42 F.3d 414, 424 n. 4 (7th Cir.1994)).

O'Connor and the amicus argue that the inference of pretext is supported in several different ways, but we are not persuaded. First, O'Connor argues that pretext is suggested by evidence that calls into question the factual accuracy of Riggs' explanation for the discharge—that O'Connor "harassed" Fritchen and refused to desist after being asked to do so. As evidence in support of this theory, however, O'Connor identifies only his own deposition testimony indicating he did not know that his behavior bothered Fritchen or that she wanted him to stop. That testimony, of course, is undermined by the above-quoted letter that O'Connor wrote to Fritchen, which clearly reflects his awareness that Fritchen wished for him to leave her alone and that she found the letters and gifts to be disturbing and inappropriate. But even if the evidence did support an inference that O'Connor was unaware of Fritchen's

perspective, it still would not save him from summary judgment. The relevant question for that purpose is whether Riggs and Nuter honestly believed that they were firing O'Connor because of the situation with Fritchen. *See Collier*, 66 F.3d at 893; *Sample v. Aldi Inc.*, 61 F.3d 544, 549 (7th Cir. 1995). In order to cast doubt on the veracity of this justification, O'Connor needs evidence suggesting either that Riggs and Nuter did not believe the events occurred or that this belief did not underlie their decision. The honesty of their belief could be called into question by evidence suggesting that the events did not actually happen (*see, e.g., Collier*, 66 F.3d at 893), such as that O'Connor did not give Fritchen the items or that she did not complain to Riggs and Nuter. But O'Connor's subjective impression, uncorroborated by any objective evidence and unknown to Riggs and Nuter, does not do the trick. Even construed in the light most favorable to O'Connor, the uncontroverted evidence reveals that Fritchen twice complained of the conduct to Riggs, that she told Riggs she was disturbed by it, and that she told him she had asked O'Connor to stop. In receipt of Fritchen's memo detailing her account, Riggs and Nuter confronted O'Connor about the conduct and decided to fire him. O'Connor's subjective impression of the situation does not support a contrary factual inference.

■ DePaul's response to O'Connor's conduct may well have been extreme or unwarranted, and according to O'Connor, it may even have violated DePaul's own personnel guidelines. But none of that is determinative here. For purposes of the ADEA, we may not be concerned with whether the decision was right or wrong, fair or unfair, well-considered or precipitous. We must look only at whether the reason was discriminatory or, in the pretext analysis, whether it actually did underlie the plaintiff's termination. *Giannopoulos*, 109 F.3d at 410–11. As we stated in *Kralman v. Illinois Dep't of Veterans' Affairs*, " '[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.' " 23 F.3d 150, 156 (7th Cir.1994), *cert. denied*, 513 U.S. 948, 115

S.Ct. 359, 130 L.Ed.2d 313 (1994) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988)); *see also Timm v. Mead Corp.*, 32 F.3d 273, 275 (7th Cir.1994) (the proffered reason "need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and, if true, (even if shortsighted or ultimately a product of poor business judgment) merely explain why the challenged action was taken.") (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373–74 (7th Cir.1992)). On the issue of pretext, our only concern is the honesty of the employer's explanation, and O'Connor has offered no evidence calling that into question here.

O'Connor and the amicus also argue that the inference of pretext is supported by the fact that Riggs explained O'Connor's discharge in several different ways over the course of June 29, O'Connor's final day at DePaul. Although Riggs initially attributed the discharge to O'Connor's "sexual harassment" of Fritchen, he described the problem in his two subsequent letters as "harassment" and "insubordination." This flux in terminology, however, does not support the inference of pretext. First, the usage appears less inconsistent when the terms are read in context. One letter attributed the dismissal to "insubordinate activities on your part which you were previously advised to cease and clearly did not," and the other "to the continued harassment of an employee of the ... management staff after you were advised to cease and desist by this employee." The fact that "harassment" may refer to the gestures and "insubordination" to continuing them after manager Fritchen had asked him to stop does not support an inference that the overall conduct was not the real reason for O'Connor's discharge. Although the two letters and even the initial oral explanation may have focused on different aspects of O'Connor's behavior, we have no doubt that all refer to the same conduct, and O'Connor has offered no evidence to suggest otherwise. The versions are not "contradictory" as O'Connor contends, but clearly refer to a singular justification for his dismissal. Pretext is not suggested. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir.

1995); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994); *Timm*, 32 F.3d at 276.

The amicus has argued that the variation in terms may reflect an ex post facto attempt by Riggs to comply with the rules set out in DePaul's employee handbook, which prohibits dismissal for sexual harassment based on just a single complaint. The switch from "sexual harassment" or "harassment" to "insubordination" was necessary, under this theory, because insubordination is the only one of the three charges that justify summary termination under the handbook. But even if the dismissal was not proper under the employee handbook and even if the managers changed their formal reason in an attempt to comply with the handbook, both reasons are supported by the record, and O'Connor has not shown them to be pretextual. Indeed, this alternative explanation for the inconsistency undermines any inference that the switch reflects an effort to hide discriminatory motives. Because O'Connor has not sued under any theory to which DePaul's compliance with its own personnel manual is relevant, we need not explore this issue further.

■ Finally, O'Connor and the amicus argue that several comments made by Riggs and Nuter reveal their age bias and support the inference that the reasons they gave for O'Connor's dismissal were pretextual. Michael Francis O'Connor, an engineer who worked at DePaul under the employ of an independent contractor, testified that in December 1991 Riggs had asked him to fire another of the contractor's employees, Al Rasmussen, who, according to Michael, Riggs referred to as a "worthless old fucker." Seventy-year-old Rasmussen corroborated Michael's account, testifying that Riggs usually greeted him as "old bastard," made frequent age-related comments, and often asked Rasmussen when he was going to retire. Michael O'Connor also testified that Nuter referred to another of the contractor's employees, Art Holmes, as a "miserable old fucker." But, although allegedly made by Riggs and Nuter, these comments do not support the inference that Robert O'Connor was terminated because of his age. O'Connor is correct in noting that "stray re-

marks"—made by the decisionmaker but not related to the disputed employment action—may be relevant to the question of pretext under the *McDonnell Douglas* burden-shifting approach, even though they do not constitute direct evidence of discriminatory intent. *Huff v. UARCO Inc.*, 122 F.3d 374, 385 (7th Cir.1997); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1406 (7th Cir.1996); *Futrell v. J.I. Case*, 38 F.3d 342, 347 (7th Cir.1994). Still, even under the indirect approach, stray remarks must be considered in the context of all the evidence, and may not overcome summary judgment if they stand alone as evidence that might support an inference of pretext. *Huff*, 122 F.3d at 385; *Fuka*, 82 F.3d at 1406. Here, Riggs' and Nuter's remarks about Rasmussen and Holmes, unaided by any additional evidence of pretext, cannot protect O'Connor from summary judgment.

### III.

O'Connor has produced no direct evidence of discrimination and no evidence from which a rational jury might infer that Riggs lied about the reasons for his actions. Although termination may have been a harsh response to O'Connor's conduct and may even have contravened DePaul's own personnel guidelines, O'Connor has failed to establish that it violated the ADEA. The grant of summary judgment in favor of DePaul is therefore AFFIRMED.