In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3001 & 99-4133

Sam Kulumani,

Plaintiff-Appellant,

v.

Blue Cross Blue Shield Association,

Defendant-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5391--James F. Holderman, Judge.

Argued May 10, 2000--Decided August 22, 2000

Before Easterbrook and Rovner, Circuit Judges./*

Easterbrook, Circuit Judge.  Blue Cross Blue
Shield Association serves as a fiscal
intermediary in the Medicare program, processing
providers' claims for reimbursement from the
federal fisc. Sam Kulumani worked in its Medicare
unit as an accountant (a position called
"consultant") between 1989 and 1997. Promoted
once in 1993, Kulumani sought another promotion
in 1996. This time he was turned down. Worse lay
in store. Since 1994 the federal government has
wanted more for less, and every year it reduced
what it paid Blue Cross for claims-processing
services. The Health Care Finance Administration,
on whose behalf Blue Cross acts, told Blue Cross
that its compensation for Medicare claims-
handling work in fiscal 1997 (beginning October
1, 1996) would be about $1 million less than for
fiscal 1996. Blue Cross decided that some
employees had to go. Kulumani turned out to be
one of those and was discharged in February 1997.
In this suit under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. sec.sec. 2000e to 2000e-
17, Kulumani accuses Blue Cross of national-
origin discrimination (his ancestors hale from
India, and Kulumani himself took a law degree
there) in both the nonpromotion decision and the
discharge decision. The district judge granted
summary judgment to Blue Cross, 1999 U.S. Dist.
Lexis 11896 (N.D. Ill. July 27, 1999), concluding
among other things that Kulumani did not have

evidence calling into question Blue Cross's explanations for its actions: that no higher position was open in 1996, and that he was let go in 1997 as the weakest of Blue Cross's comparable employees.

We start with Kulumani's quest for a promotion. One of the reasons the district court gave--that losing an opportunity to be promoted is not an adverse job action and hence is not covered by Title VII--has been disapproved by an opinion released after the district court made its decision. See Hunt v. Markham, No. 99-1331 (7th Cir. July 11, 2000). But other grounds, including the lack of vacancies, support the judgment. Kulumani observes that several positions for which he was qualified were open toward the end of fiscal 1996, but none of these was filled. The only hiring or promotion into a Grade 13 position (the level Kulumani sought) during 1996 occurred in January; hiring and promotions later were frozen. Kulumani believes that he should have received the Grade 13 appointment in January 1996, but if this was the discriminatory act then Kulumani's charge of discrimination, filed in February 1997, was untimely. Only a failure to promote within the preceding 300 days could have been within the scope of the charge, but it is undisputed that no one was promoted to Grade 13 during those 10 months. Kulumani cannot show that Blue Cross's decision not to promote him was discriminatory; all aspirants for promotion were treated alike.

The existence of a budget crunch requiring staff trimming in fiscal 1997 likewise is undisputed. Kulumani contends, however, that Esther Peterson should have been released in his stead. The district court's opinion recounts the undisputed facts, so we can summarize. Blue Cross required its managers to pare their staffs using performance and seniority as benchmarks, but without any mechanical rule. Wilson Leong, the manager of the unit where Kulumani worked, was told that he and the heads of other units had to select three employees for layoff; Kulumani was not among the three on the unit directors' list. Kari Kronborg, Blue Cross's Director of Human Resources, decided to satisfy herself that the selections were prudent, and she eventually concluded that Kulumani should be dismissed instead of Peterson. Kulumani insists that Kronborg's intervention is suspicious, and that had Blue Cross followed its normal approach Peterson would be gone and he would still be employed.

Unusual yes, suspicious no. A Director of Human Resources who always went along with whatever proposals crossed her desk might as well be a

doormat. Quality-control checks are prudent, and occasionally these lead to different decisions; that's what upper-level managers are there for. To show that Kronborg's intervention was a pretext for discrimination Kulumani needed to establish not that it was unusual but that the stated reason (quality control) was a fabrication, designed to conceal an unlawful reason. A "pretext for discrimination" means more than an unusual act; it means something worse than a business error; "pretext" means deceit used to cover one's tracks. See Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2108-09 (2000). But of this Kulumani has no evidence--no statements by Kronborg, no disparate impact from managerial interventions, nothing except the raw fact that Kronborg stepped in.

Nor could the reasons Blue Cross gave for keeping Peterson over Kulumani be deemed a pretext for discrimination--not by a reasonable trier of fact, anyway. It is undisputed not only that seniority played a role in Blue Cross's selection of candidates for layoff but also that Peterson joined Blue Cross 20 years before Kulumani. The other factor was performance, and here Kulumani says that he and Peterson were tied: they had the same overall supervisory rating. If that is so, then seniority won out and Kulumani has no complaint.

What is more, we do not think that a reasonable trier of fact could conclude that Kronborg lied when she said that Kulumani and Peterson were not tied in performance assessments. Blue Cross rates its accountants on a four-level scale; the levels' names are bureaucratese, so we use numbers, where level 1 indicates praiseworthy performance and level 4 denotes an employee who can't cut the mustard. Peterson had a total of 9 ratings from her supervisors in 1996, receiving 2 level 1 grades and 7 level 2 grades. Kulumani also had 9 ratings: 1 level 1, 4 level 2, and 4 level 3. Kulumani says that his ratings were the same as Peterson's, and if we looked only at medians that would be true: each set of 9 ratings has a median of level 2. But Kulumani's average rating for 1996 was 2.3, while Peterson's average rating was 1.8. Summaries accompanying these ratings accorded with their numerical level; Leong noted that Kulumani's work was "inconsistent" and that he was perceived by his peers as "doing the minimum to get by." Kulumani was the only accountant in his unit who received any level 3 rating in 1996, a fact that Blue Cross could deem significant. Title VII does not require employers to use medians rather than means; medians give less weight to extremes, but means convey more information. To establish that this was a put-up job, Kulumani would have to

show that the ratings were themselves discriminatory--perhaps that Kronborg manipulated Kulumani's supervisors into downrating him so that she could ax him at the next budget cut. But Kulumani does not contend that the ratings reflect national-origin discrimination. Leong, the head of Kulumani's unit (and thus directly or indirectly responsible for the ratings in his file), initially favored retaining Kulumani over Peterson. Kulumani argues only that Kronborg used nondiscriminatory ratings in a discriminatory manner, and that argument is too weak to persuade a rational jury. Kulumani has no evidence--none at all--suggesting that his national origin played a role in the decision. He wants to put to a jury the question whether Blue Cross would have been better served with his services rather than Peterson's, but Title VII is some distance from the sort of just-cause rule that labor arbitrators apply.

Other circumstances that Kulumani deems odd are the sort of vagaries inevitable in any substantial organization. Cf. Kuhn v. Ball State University, 78 F.3d 330 (7th Cir. 1996). Kulumani pins his hopes on the proposition that if doubt can be cast on any part of the employer's process, then the trier of fact may deem the whole explanation a pretext for discrimination. Reeves makes it clear, however, that pretext means a dishonest explanation, a lie rather than an oddity or an error. 120 S. Ct. at 2108. In every lengthy process any given step may be a one-in-ten or one-in-fifty occurrence (to use an example from this case, the failure of a particular supervisor to participate in the decision, which Kulumani deems ominous). This does more to illustrate the stochastic quality of human activity, however, than to show that someone must be covering up an unlawful motive. Improbable events happen regularly. In a handful of sand, some of the grains will be weirdly shaped or contain minerals from far away, minerals that weren't supposed to be on that beach. Just so with bureaucratic decisions, which entail scores of steps. The truly suspicious decision would be the one reached following perfect adherence to all formal rules.

Kulumani also contends that Blue Cross held his national origin against him when it failed to rehire him a year later for vacancies caused by the resignations or retirements of other accountants. Other accountants laid off with Kulumani were rehired to fill two of these vacancies. Nothing in the record suggests that Kulumani applied for these spots, however, and there is a further obstacle to recovery on this ground: Kulumani did not file with the EEOC a charge of discrimination on this theory. The only

charge he filed came in February 1997, long before the supposedly discriminatory failure to rehire.

Although we therefore affirm the district court's decision on the merits, we remand on a procedural matter. The district court awarded Blue Cross about $8,000 for copying expenses as part of the costs assessed under 28 U.S.C. sec.1920 and Fed. R. Civ. P. 54(d). Section 1920(4) allows a judge to tax as costs "[f]ees for exemplification and copies of papers necessarily obtained for use in the case". Kulumani contends that no more than one copy ever can be "necessarily obtained," but Haroco, Inc. v. American National Bank, 38 F.3d 1429, 1441 (7th Cir. 1994), his sole appellate authority for this proposition, does not support it. In Haroco itself the court stated that expenses for two sets of copies (one for each side's lawyers) could be taxed as costs. But in this case Blue Cross billed for five sets of many papers, perhaps more sets for others, substantially exceeding what Haroco deemed reasonable. We recognize that a district judge has discretion to determine what copies were "necessarily obtained for use in the case", but in this case the judge did not explain why it was necessary to make so many sets of copies. Two copies of every document filed with the court or provided to opposing counsel makes sense; it is easy to see why each is useful. Charging for more if the court requires more to be filed also makes sense. Five or six copies of everything for the apparent convenience of a platoon of lawyers at a large defense firm is harder to justify as the sort of outlay that may be shifted to one's adversary. The district judge should take another look at this subject.

Affirmed and Remanded

/* After oral argument, Judge Ripple determined that circumstances, not previously ascertainable, required his recusal. He therefore ceased to participate in the consideration or decision of the case. The decision is being issued by a quorum of the panel. 28 U.S.C. sec.46(d).